[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15098

_____

D.C. Docket No. 4:18-cv-00220-CDL

HUNTER TILLIS,
NANCY SORRELLS,
as grandmother, legal custodian and
administratrix of the estate of C.R.
on behalf of
MINOR CHILD,
HANNAH WUENSCHEL,

Plaintiffs-Appellees-Cross Appellants,

versus

ALLAN H. BROWN, JR.,
in his official and individual capacities,
CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA,

Defendants-Appellants-Cross Appellees,

RICKY BOREN,
in his official and individual capacities,

Defendant-Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(September 7, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and ED CARNES, Circuit
Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a police officer, after a high-speed chase, reasonably used deadly force when he stepped out of his vehicle to make an arrest and the suspect's nearby car suddenly went into reverse. Christian Redwine led officers from the Columbus Police Department on a high-speed chase across state lines before crashing into bushes on the side of a road. The driver of the lead police vehicle, Officer Allan H. Brown Jr., stopped behind and to the right of Redwine's car. Seconds after Officer Brown stepped out to make an arrest, the car's reverse lights turned on, and the car started backing up. Officer Brown fired 11 shots through the back windshield and side windows as the car passed near him. Then he changed magazines and fired another 10 shots. Redwine was killed, and his two passengers were injured. The surviving passengers and Redwine's grandmother sued Officer Brown for allegedly using excessive force during the encounter, as well as the police chief and the county for supervisory liability. Officer Brown moved for summary judgment based on qualified immunity. The

2

district court granted the motion for Officer Brown as to the first round of shots but denied it as to the second. Because Officer Brown acted reasonably in firing both rounds of shots, we affirm in part, and we reverse in part and render a judgment in favor of Officer Brown, the police chief, and the county.

## I. BACKGROUND

Christian Redwine lived with Nancy Sorrells—his custodial grandmother—and Fred Levins in Columbus, Georgia. Levins was a car salesman and kept several vehicles at his home. One of these vehicles was a Pontiac G6.

On the night of November 5, 2016, Redwine was at his home with his cousin, Hunter Tillis, his friend, Hannah Wuenschel, and Wuenschel's infant son. Sometime after Levins went to sleep, Redwine, Tillis, and Wuenschel left Wuenschel's baby at the house and drove away with the Pontiac so that Redwine could speak with his girlfriend. When they were unable to find his girlfriend at her home, they decided to drive around town looking for her. Redwine drove, Wuenschel sat in the front passenger's seat, and Tillis sat in the driver's-side back seat.

Levins woke up at about 1 a.m. on November 6 and realized that his Pontiac was missing, as were Redwine, Tillis, and Wuenschel. At 3:34 a.m., he called 911 and reported that his Pontiac had been taken. The police called him back a few minutes later to ask if he knew who was responsible, and he said it was his

3

grandson, his grandson's cousin, and another girl who had left her baby at his home "for three solid hours." Levins also told the police that his grandson was 17, that he had been in jail three times in the last year, and that he "just got out." Finally, he told the police that he wanted the three individuals who had taken his Pontiac "in jail."

About an hour later, an unmarked police vehicle spotted the Pontiac and began following it. As soon as the police vehicle turned on its blue lights, the Pontiac sped off. As Tillis testified, "the blue lights lit up, and as soon as they lit up, Christian smashed the gas." Wuenschel testified that "he just slammed it back and we went." Other police vehicles joined the chase and pursued the Pontiac through commercial and residential areas of Columbus, including when the car drove the wrong way down a one-way street. At one point, the police lost sight of the Pontiac. But as soon as they spotted it parked on the side of the road, it drove off and headed toward the Alabama border. Tillis testified that Redwine was "driving . . . crazy" "at a high rate of speed," he "bl[ew] through a couple of stop signs," and "he had to lock the brakes up every time he came to an intersection just to turn." Tillis also testified that Redwine "was just panicking," "[h]e didn't know what to do," and "[h]e was saying he didn't want to go back to jail." In her testimony, Wuenschel described how she was "screaming" and "crying" because

4

Redwine "was going way too fast" and she was afraid that the Pontiac was going to "wreck[]" or to "hit somebody else."

As the chase continued into Phenix City, Alabama, Officer Allan Brown took over as the lead police vehicle. He called in regular updates to the 911 dispatcher and reported that the Pontiac was driving at speeds up to 107 miles per hour. The dash camera video from his police cruiser shows the Pontiac veering between lanes and running at least one red light.

The Pontiac exited the highway at about 70 miles per hour and crashed into bushes on the side of the road. By that time, the chase had lasted 13 minutes and 40 seconds and had covered 14.6 miles. Officer Brown reported that the Pontiac was "wrecked out" and "spinning," and he told the dispatcher to "[s]tart a rescue." He parked his vehicle behind and to the right of the Pontiac, at an angle to the right rear bumper, and stepped out to make an arrest.

Seconds after Officer Brown got out of his vehicle, the Pontiac's reverse lights turned on. Officer Brown began shooting at the Pontiac with his service pistol and continued doing so as the Pontiac drove past him in reverse. He fired a total of 11 shots—the chambered round plus a 10-round magazine—through the back windshield and the rear and front passenger windows. All 11 of the shots were fired as the Pontiac was going in reverse. It rolled across the road and came to a stop. Its engine continued to run and its headlights remained on as Officer Brown

5

faced it. Officer Brown changed magazines and fired another 10 shots at the front of the Pontiac.

About three seconds elapsed during the first round of 11 shots, six seconds elapsed between the two rounds of shots, and another three to four seconds elapsed during the second round of 10 shots. All of the shots in both rounds were fired in fewer than 13 seconds. Tillis and Wuenschel got out of the Pontiac and onto the ground, and Officer Brown held them at gunpoint until backup arrived. Officer Brown reported to the dispatcher that shots had been fired and that the Pontiac had "tried to run [him] over." Redwine died from his gunshot wounds, and Tillis and Wuenschel were both injured.

Sorrells, acting as administratrix of Redwine's estate, Tillis, and Wuenschel, each brought separate actions against Officer Brown, the Columbus Police Department, Police Chief Ricky Boren, and the Consolidated Government of Columbus, which Georgia treats as a county for purposes of tort liability. *See Bowen v. Columbus*, 349 S.E.2d 740, 741, 743 (Ga. 1986). They alleged that Officer Brown's unreasonable seizure and excessive use of force violated their rights under the Fourth and Fourteenth Amendments. 42 U.S.C. § 1983. They also alleged that Chief Boren, the county, and the police department were liable for supervising Brown and for having customs, policies, and practices that contributed to the violations of their rights. *Id.* Finally, they brought numerous state-law

6

claims, including excessive use of force, unlawful seizure, and assault and battery. The district court consolidated the three actions. *See* Fed. R. Civ. P. 42. And the parties agreed to dismiss the Columbus Police Department as a defendant.

Officer Brown, Chief Boren, and the county moved for summary judgment. The district court granted only partial summary judgment. It first addressed the federal individual-capacity claims against Officer Brown, and it divided those claims in three groups: the pre-shooting pursuit, the first round of shots, and the second round of shots. It ruled that Tillis, Wuenschel, and Sorrells failed to establish a substantive-due-process violation during the pre-shooting pursuit. As to the first round of shots, it concluded that Officer Brown did not violate the Fourth Amendment because he could have reasonably believed that the Pontiac was attempting to hit him when it backed up. But it denied Officer Brown qualified immunity as to the second round of shots on the ground that no reasonable officer would have concluded that the Pontiac posed an imminent threat of serious physical harm to himself or to others when he fired his gun.

The district court then turned to the federal claims against Chief Boren and the county. It ruled that because Officer Brown committed no constitutional violations as to the pre-shooting pursuit or to the first round of shots, both Chief Boren and the county were entitled to summary judgment as to those claims. As for the second round of shots, it ruled that Chief Boren was not personally involved in

7

the pursuit and shooting, did not direct Officer Brown to act unlawfully, did not have a "policy or custom that resulted in Brown's deliberate indifference to [the] [p]laintiffs' constitutional rights," and did not know Officer Brown would use excessive force and fail to stop him from doing so. So it concluded that he was entitled to summary judgment as to the second round of shots as well. But it denied the county summary judgment as to the second round of shots because the county's motion "relied primarily on [the] contention that Brown committed no constitutional violations." The district court ruled that it would permit discovery on the "narrow issue" whether the county had a policy, practice, or custom—implemented through an official other than Chief Boren—that contributed to Officer Brown's alleged constitutional violation when he fired the second round of shots.

Finally, the district court addressed the state-law claims. It ruled that the county was entitled to summary judgment based on sovereign immunity. As for the claims against Officer Brown and Chief Boren, the district court decided it was unnecessary to resolve whether Georgia or Alabama laws for official immunity applied because there was no significant difference between them. It ruled that Chief Boren was entitled to state-law immunity as to all claims against him. And it ruled that Officer Brown was entitled to state-law immunity for the claims

8

involving the pre-shooting pursuit and the first round of shots but not for the second round.

Officer Brown and the county appealed the denial of summary judgment for the claims involving the second round of shots. Tillis, Wuenschel, and Sorrells cross-appealed the partial summary judgment in favor of Officer Brown and the county as to the first round of shots and the summary judgment in favor of Chief Boren on all claims.

## II. STANDARDS OF REVIEW

We review the grant or denial of qualified immunity and state-law immunity at summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party. *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012); *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir. 1992). We review our own jurisdiction *de novo*. *Chao Lin v. U.S. Att'y Gen.*, 677 F.3d 1043, 1045 (11th Cir. 2012).

## III. DISCUSSION

We begin by addressing our jurisdiction. "As a general rule," we have jurisdiction to review the decisions of a district court "only where the district court has disposed of all claims against all parties." *Hudson v. Hall*, 231 F.3d 1289, 1293 (11th Cir. 2000); *see* 28 U.S.C. § 1291. "But[] an exception to the general rule exists in qualified immunity cases[.]" *Hudson*, 231 F.3d at 1293. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an

9

issue of law, is an appealable 'final decision' within the meaning of [section] 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The denial of immunity for state officials under both Georgia and Alabama law is also an immediately appealable order. *See Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998); *Griesel*, 963 F.2d at 341. So we have jurisdiction to review the denial of qualified immunity and state-law immunity as to the claims against Officer Brown involving the second round of shots.

Because the district court did not dispose of all claims, we would ordinarily lack jurisdiction to review the remaining claims raised in the appeals and cross-appeals. But, under the doctrine of pendent appellate jurisdiction, we "may address nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter." *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th Cir. 2008) (alteration adopted) (internal quotation marks omitted). "Matters may be sufficiently intertwined where they implicate the same facts and the same law." *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016) (alteration adopted) (internal quotation marks omitted). "[T]he Supreme Court has signaled that pendent appellate jurisdiction should be present only under rare circumstances." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (citing *Johnson*

10

*v. Jones*, 515 U.S. 304, 318 (1995); *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 49–50 (1995)).

The remaining appeal and cross-appeals fall within the rare exception for pendent appellate jurisdiction. As to the cross-appeals from the summary judgment in favor of Officer Brown, whether Officer Brown acted reasonably in firing the first round of shots "implicates the same facts and the same law" as whether he acted reasonably in firing the second round of shots just a few seconds later. *Smith*, 834 F.3d at 1292 (alteration rejected) (internal quotation marks omitted); *see also Hudson*, 231 F.3d at 1293–94 (concluding that claims involving the same traffic stop were inextricably intertwined). We may also exercise our pendent appellate jurisdiction to review the appeal from the denial of summary judgment as to the federal claim against the county involving the second round of shots and to review the cross-appeals from the summary judgment in favor of Chief Boren and the county. Here, the claims against Chief Boren and the county are derivative of the claims against Officer Brown. So if Officer Brown did not commit a constitutional violation, then Chief Boren and the county are entitled to summary judgment. Because the nonappealable decisions are inextricably intertwined with the appealable decisions, the former fall within our pendent appellate jurisdiction.

Having satisfied ourselves of our jurisdiction, we turn to whether Officer Brown violated the Fourth Amendment when he used deadly force. If Officer

11

Brown did not violate the plaintiffs' constitutional rights, then he is entitled to qualified immunity, which "protects a government official from being sued for damages under [section] 1983 unless preexisting law clearly establishes the unlawfulness of his actions." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019). The parties agree that if Officer Brown is entitled to qualified immunity, then he is also entitled to state-law immunity. Finally, if Officer Brown did not violate the Fourth Amendment, then Chief Boren and the county are entitled to summary judgment as well. So if we conclude that Officer Brown did not violate the Fourth Amendment, then we must resolve all claims in favor of the defendants.

Under the Fourth Amendment, we evaluate Officer Brown's use of deadly force based on an objective standard of reasonableness. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). That standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "The inquiry requires analyzing the totality of the circumstances." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014).

Although we construe the facts in the light most favorable to the plaintiffs, *Hunter*, 941 F.3d at 1279, we determine reasonableness from the perspective of "a

12

reasonable officer on the scene at the time the events unfolded," *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (internal quotation marks omitted). Our inquiry does not employ "the 20/20 vision of hindsight." *Plumhoff*, 572 U.S. at 775 (internal quotation marks omitted). Instead, we "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (alteration adopted) (internal quotation marks omitted). "[I]t is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) (internal quotation marks omitted).

"[W]e have consistently upheld an officer's use of deadly force in cases where the officer reasonably believed his life was endangered by a suspect who used or threatened to use his car as a weapon." *Id.* at 1181–82 (internal quotation marks omitted). For example, in *Pace v. Capobianco*, we held that officers reasonably used deadly force to stop a suspect whom they had cornered after a high-speed chase and who refused to get out of his car, kept the engine running, and started driving forward. 283 F.3d 1275, 1277–78, 1281–82 (11th Cir. 2002). We explained that the suspect had used his car "in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with

13

which [he] was armed." *Id.* at 1282. Likewise, in *Robinson v. Arrugueta*, we held that an officer reasonably used deadly force when a suspect started driving toward him at one to two miles per hour, threatening to crush him against another car in a matter of seconds. 415 F.3d 1252, 1254, 1256 (11th Cir. 2005). We also held in *McCullough v. Antolini* that sheriff's deputies reasonably used deadly force against a suspect who, after a high-speed chase, "repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward [a] deputy standing nearby in a parking lot." 559 F.3d 1201, 1208 (11th Cir. 2009). Finally, in *Singletary v. Vargas*, we held that a sheriff's deputy reasonably used deadly force when he was near the front of a suspect's car and it accelerated towards him. 804 F.3d at 1176, 1178, 1182–84.

Officer Brown reasonably perceived that his life was in danger when the Pontiac shifted into reverse. Redwine had led the police on a high-speed chase through commercial and residential areas and across state lines before he crashed. Only a few seconds had elapsed between when Officer Brown got out of his vehicle and when the Pontiac started backing up. A reasonable officer in hot pursuit could perceive that the chase was not yet over and that Redwine would continue to drive recklessly to evade arrest. *See Pace*, 283 F.3d at 1282. Officer Brown was on foot next to his vehicle, where he was exposed to danger. The Pontiac could have struck him as it drove past him. Indeed, the plaintiffs' expert

14

witness estimated that the Pontiac passed within two feet of Officer Brown. In close proximity to a moving vehicle, with only seconds to react, Officer Brown had reason to believe that his life was in danger. *See Singletary*, 804 F.3d at 1182; *Robinson*, 415 F.3d at 1256. So he could reasonably use deadly force to defend himself.

We are not persuaded by the plaintiffs' arguments that Officer Brown was indisputably out of harm's way. For the purposes of summary judgment, we accept the undisputed evidence that Officer Brown was positioned in the "V" between his police vehicle and its open driver's door and that, as it turned out, the Pontiac drove straight back. Viewing that evidence in the plaintiffs' favor, it was not unreasonable for Officer Brown to conclude at the time he fired the shots that the Pontiac posed a serious danger. When an officer is on foot and standing in close proximity to a suspect's moving vehicle, he need not be directly in the vehicle's path to fear reasonably for his life. It is "obvious," in this circumstance, that the suspect could quickly turn his steering wheel and swerve toward the officer. *Long v. Slaton*, 508 F.3d 576, 581 n.7 (11th Cir. 2007). Inside a "V" between the open door of his police vehicle and a car moving in his direction does not guarantee an officer's safety. Being crushed between a car door and the car is little better, if at all, than being run over. *See Robinson*, 415 F.3d at 1256 (concluding that deadly force was justified where the officer "had to make a split-second decision of

15

whether he could escape before he got crushed" between a moving and a stationary vehicle). That the Pontiac avoided hitting Officer Brown or the door he was behind is not dispositive because we do not evaluate the totality of the circumstances with "the 20/20 vision of hindsight." *Plumhoff*, 572 U.S. at 775 (internal quotation marks omitted).

The dissent argues that the "supposition that [the Pontiac] could suddenly have changed direction and hit [Officer] Brown is contrary to the record and the laws of physics." Dissenting Op. at 38. But even if it were true that "the Pontiac could not possibly have swerved to hit [Officer Brown]" based on its turning radius and its angle and distance to the officer, *id.* at 37, the relevant question is whether it was reasonable for Officer Brown to fear otherwise the moment the Pontiac started backing up. "Perspective . . . is crucial to the analysis," and "the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Jean-Baptiste*, 627 F.3d at 821 (alteration adopted) (internal quotation marks omitted). When the Pontiac started backing up, Officer Brown had no way of knowing whether it would continue in a straight line or swerve toward him. He had "no reason to trust that [the driver] would not suddenly attempt to do him harm." *Id.* at 822 (internal quotation marks omitted). And, in the split second that he had to react, he certainly did not have time to calculate angles and trajectories to determine whether he was a few feet outside of harm's way.

16

The dissent cites *Singletary* for the proposition that "close proximity to a vehicle has never been enough to justify the use of deadly force," Dissenting Op. at 35–37, but that opinion said no such thing. In *Singletary*, the district court misstated the record about the police officer's position and concluded that he was not in the path of a vehicle at the time he fired his gun. 804 F.3d at 1182. We reversed because the video evidence showed that the officer was in the path of the vehicle when it accelerated. *Id.* at 1183. But we never stated that the officer was *required* to be in the direct path of the moving vehicle to have a reasonable fear for his safety. It is enough that "a reasonable officer would have reasonably perceived that he was in imminent danger of being run over by [the suspect's] car." *Id.* at 1182.

The dissent also minimizes the danger posed by the Pontiac. It argues that Redwine's "driving did not come close to the level of recklessness and purposeful endangerment" that would justify the use of deadly force and that Redwine "never steered the Pontiac toward any other vehicles or people." Dissenting Op. at 34. But the dissent does not dispute that the Pontiac closed the distance to Officer Brown as it reversed out of the bushes and that it "came within two to four feet from him." *Id.* at 37. And the Pontiac did so only after driving at dangerously high speeds and crashing on the side of the road. That the roads were mostly empty that night is irrelevant to whether Officer Brown reasonably believed that Redwine was

17

attempting to use the Pontiac as a weapon against him. *Id.* at 31–32. Moreover, Tillis conceded during his deposition that Redwine could have crashed the Pontiac into a house or a tree or a parked car.

The dissent argues against a straw man when it asserts that "[d]riving recklessly to evade arrest is not enough to justify shooting the driver." Dissenting Op. at 33 (internal quotation marks omitted). Officer Brown did not fire his gun because Redwine was driving the Pontiac recklessly; he fired because the Pontiac started backing up while he was behind it. When a fleeing suspect drives his vehicle toward an officer who is standing only a few feet away, it is reasonable for the officer to believe that his life is in danger.

The dissent suggests that we are misrepresenting *Long v. Slaton*, where we stated that it was an "obvious" fact that a suspect in a vehicle "could have quickly shifted gears and accelerated towards [the officer who was on foot and attempting to arrest him] at any time." 508 F.3d at 581 n.7. The dissent states that the suspect in *Long* was having a psychotic episode and the officer gave a warning before using deadly force. Dissenting Op. at 38 n.5. But that background information does not make our statement about the "obvious" danger to the officer any less true. Regardless of a suspect's mental health or whether a police officer has time to give a warning, it is beyond dispute that it takes only a few seconds to accelerate a car in the direction of a police officer who is on foot and attempting to make an arrest.

18

Officer Brown reasonably continued to use deadly force when he fired the second round of shots six seconds later. "A police officer is entitled to continue his use of force until a suspect thought to be armed is fully secured." *Jean-Baptiste*, 627 F.3d at 821 (internal quotation marks omitted). He is "not required to interrupt a volley of bullets until he kn[ows] that [the suspect] ha[s] been disarmed." *Id.* at 822; *see also Plumhoff*, 572 U.S. at 777 ("[I]f lethal force is justified, officers are taught to keep shooting until the threat is over." (internal quotation marks omitted)). Nor is he required to wait for a car that has just stopped to begin moving again in his direction. *See Pace*, 283 F.3d at 1278, 1282 (holding that an officer did not violate the Fourth Amendment when he started firing at a car that had been "stopped for, at most, a very few seconds"). A reasonable officer who had nearly been struck by a suspect's moving vehicle could perceive that the vehicle, with its engine still running and its headlights still shining as it faced him, remained a dangerous weapon that continued to pose a threat until the driver was fully secured.

The district court erred in concluding that no reasonable officer would have thought that the Pontiac posed an imminent threat of serious physical harm when Officer Brown fired the second round of shots. "Even if we accept that the threat posed" to Officer Brown "was not immediate in that the [Pontiac] was not moving toward [him]" when the second round of shots was fired, "the law does not require

19

officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long*, 508 F.3d at 581. Again, an objectively reasonable officer would have known the "obvious" fact that the driver of the Pontiac "could have quickly shifted gears and accelerated towards [him] at any time." *Id.* at 581 n.7. Officer Brown, having just engaged in a high-speed chase in the middle of the night, found himself staring into the headlights of a vehicle that had seconds ago backed up without warning and passed within only a few feet of him. Because the headlights were shining in his eyes, he could not see whether the driver was disabled or was about to shift into forward, step on the gas, and run over him. A reasonable officer in his shoes could have concluded, in the few seconds that he had to decide, that his life was still in danger. So Officer Brown was entitled to continue using deadly force.

The dissent argues that the second round of shots was not justified because Officer Brown "unnecessarily . . . placed himself in a dangerous position" by "advanc[ing] toward the car like [he] did." Dissenting Op. at 40, 41 n.7. Respectfully, what was Officer Brown supposed to do instead? As a police officer, he had a duty to protect his community, even at the risk of his own life. And that duty required him to arrest the driver of the Pontiac who had led officers on a high-speed chase. The dissent is wrong to imply that Officer Brown "manufacture[d]" the danger to which he was exposed. *Id.* at 41 n.7 (internal quotation marks

20

omitted). Courage in the line of duty should be commended, not condemned. It certainly should not subject an officer to liability for damages.

The dissent engages yet another straw man when it challenges the "faulty premise" that the driver of the Pontiac "posed a threat of harm to the public so serious that [Officer] Brown had to use deadly force to stop him." *Id.* at 41. Officer Brown did not have a duty to use deadly force to end the high-speed chase, but he did have a duty to arrest the driver of the Pontiac, who had led the police on a dangerous chase across state lines. While carrying out that duty, he reasonably perceived that his own life was in danger when the Pontiac started backing up in his direction. Only then did he use deadly force. *See Rockwell v. Brown*, 664 F.3d 985, 992 (5th Cir. 2011) (explaining that there was no Fourth Amendment violation because, "in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others").

One final point merits a response. The dissent describes the series of events leading up to the shooting as a "joy ride" taken by three "teenagers." Dissenting Op. at 24. The record belies the dissent's rose-colored narrative. Redwine, who was 17 years old at the time of the shooting, had a lengthy juvenile record, including an 18-month sentence in a youth development campus. He had also recently been charged as an adult with first-degree burglary, spent two months in jail, and been released on bond less than a week before the shooting. Tillis, who

21

was 19 years old at the time, likewise had a lengthy criminal record, including charges of first-degree arson and first-degree burglary. He testified in his deposition that, in the two days leading up to the shooting, he and Redwine abused cold medication and Xanax and used marijuana and cocaine. Redwine never had a driver's license, and Tillis admitted that Redwine "couldn't drive" and that his control over the Pontiac during the chase "was not good." Finally, Tillis stated that in the seconds before Redwine put the Pontiac in reverse, Redwine said that he "ain't going back to jail" and that "it's them or me."

Moreover, we review the use of deadly force for objective reasonableness. *Garner*, 471 U.S. at 7. Under that standard, "the United States Supreme Court . . . [has] allowed the collective knowledge of investigating officers to be imputed to each participating officer." *Terrell*, 668 F.3d at 1252 (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)). The police were aware of Redwine's criminal history because his grandfather reported to them that Redwine had been jailed three times in the last year and had been only recently released from jail.

Because Officer Brown acted reasonably in firing both the first and second rounds of shots, he did not violate the Fourth Amendment, and he is entitled to qualified immunity. He is also entitled to state-law immunity, and Chief Boren and the county are entitled to summary judgment for all claims against them as well.

22

## IV. CONCLUSION

We **REVERSE** the decision to deny qualified immunity and state-law immunity to Officer Brown as to the second round of shots, and we **RENDER** a judgment in favor of Officer Brown. We also **REVERSE** the decision to deny summary judgment to the Consolidated Government of Columbus as to the second round of shots, and we **RENDER** a judgment in favor of the county. We **AFFIRM** the summary judgment on all remaining claims against Officer Brown, Chief Boren, and the Consolidated Government of Columbus.

JILL PRYOR, Circuit Judge, dissenting:

When unarmed occupants of a vehicle who are not suspected of a dangerous crime flee police, the Fourth Amendment ordinarily prohibits the use of deadly force to stop them. The majority opinion concludes that a police officer was justified in shooting three unarmed teenagers who took a family member's car on a joy ride. As they fled from police and attempted to evade arrest, they posed no serious threat to any person. The majority opinion's conclusion, which holds that no Fourth Amendment violation occurred, is based on a grave misreading of our precedent. I fear the majority opinion may be read to justify the use of deadly force any time when, after a suspect flees the police in a vehicle, an officer approaches on foot. Because this would result in an unprecedented expansion of law enforcement officers' permissible use of deadly force, I dissent.

## I.    BACKGROUND

This unnecessary tragedy began one evening when three teenagers—Christian Redwine, Hunter Tillis, and Hannah Wuenschel—took Christian's grandfather's Pontiac G6 for a joy ride around Columbus, Georgia.[1] When he realized the Pontiac was missing in the middle of the night, Christian's grandfather called the police. He gave the police a description of the vehicle and confirmed

---

[1] The Pontiac's owner, Fred Levins, was not Christian's biological grandfather, but he lived with Christian's grandmother and Christian and referred to Christian as his grandson.

that it had been taken by his grandson and two other teens. After the teens had driven around for a few hours, the Pontiac was spotted by a police officer. When the officer turned on his blue lights, the Pontiac fled, and a high-speed car chase ensued.

Officer Allan H. Brown, Jr. was not on the team that was investigating the stolen Pontiac that night. Instead, when he heard there was a car chase underway, he decided to join on his own initiative. Within 30 seconds of spotting the Pontiac, Brown sped past two other police cars and announced to dispatch that he was "taking primary." Doc. 48, Ex. G at 3:40–3:48.[2] The chase continued for only about four minutes after Brown took over. During that brief time, Brown and the Pontiac passed only a few cars on the road, all of which were several lanes away and on the other side of a median. Near the end of the chase, Brown radioed in that there was "zero traffic." *Id.* at 6:49. Brown did not observe the Pontiac veering off the road or coming close to hitting another moving car or any person. The chase ended when the Pontiac spun out and crashed into some bushes on the side of a deserted road.

After the Pontiac crashed, Brown radioed in that he was "start[ing] a rescue" as he drove up to the stopped Pontiac. *Id.* at 7:53–54. He parked his police car at a 45-degree angle to the side of the Pontiac's passenger-side rear quarter. He stood

---

[2] "Doc." numbers refer to the district court's docket entries.

about five to seven feet behind and two to four feet to the right of the car as he faced the vehicle. This put him between five and eight feet diagonally from the Pontiac's rear corner. Brown's account of his location after he exited his vehicle conflicts with the plaintiffs' account, but on review of summary judgment we accept the plaintiffs' version. Casting the evidence in the light most favorable to the plaintiffs, Brown was never directly behind the Pontiac, he was off to the side. Indeed, according to the plaintiffs' expert, experienced police officers, like Brown, would never "put themselves in [the path of a vehicle] following a high-speed pursuit." Doc. 41-8 at 12.

Despite beginning what he characterized as a "rescue," Brown drew his firearm as he exited his car. Just then the Pontiac's reverse lights came on, and it began to back up in an apparent attempt to flee. The police car's dash cam video shows the Pontiac reversing at a relatively slow, even rate of speed.

As the majority opinion correctly describes it, the Pontiac "drove straight back," not to the side toward Brown. Maj. Op. at 15. Although he was not in a position to be struck by the Pontiac, Brown immediately began shooting into the Pontiac's rear window, aiming toward the driver. He gave no instructions or warnings to the teenagers before he began to shoot. Brown fired 11 shots into the car in the span of about three seconds. He moved parallel to the Pontiac as it drove past him, his bullets entering both passenger side windows. As he continued

26

shooting, Brown was never in imminent danger of being struck by the Pontiac, despite its passing within a few feet of him. The plaintiffs' expert's reconstruction of the scene demonstrated that even if Christian had tried to swerve the Pontiac toward Brown, which he never did, the Pontiac would not have hit Brown based on his location relative to it. *See* Doc. 41 at 263 (opining that even "had [Christian] turned the steering wheel to the left, there's no way he's hitting Brown").

The Pontiac then rolled across the road and came to a "gentle" stop on the other side with its engine still running. Doc. 35 at 137–38. Brown walked across the road toward it as he inserted a new magazine into his firearm. He paused when he was standing directly in front of the stationary Pontiac and, again without warning, fired ten shots into the windshield toward the driver. While Brown was reloading and shooting into the car a second time, Hannah was screaming that she had been shot and pleading for Brown to stop. When Brown stopped shooting, one child—Christian—was dead, and two others—Hunter and Hannah—were seriously wounded. Hunter had been shot in the face and Hannah in the shoulder and arm.

Nancy Sorrells, Christian's grandmother and the administratrix of his estate, along with Hunter and Hannah, sued Brown, Columbus Police Chief Ricky Boren, and the Consolidated Government of Columbus, Georgia for violating the teenagers' constitutional rights by using excessive and deadly force in the shooting. After limited discovery on the issue of immunity, the defendants moved

27

for summary judgment based on qualified and sovereign immunity.  The district court granted summary judgment to all defendants on the first series of shots, finding that Brown did not violate the Fourth Amendment when he fired into the Pontiac as it reversed.  The court denied qualified immunity, however, on the second series of shots, concluding a reasonable jury could find that Brown violated the teenagers' clearly established Fourth Amendment rights when he fired into the Pontiac the second time.

The plaintiffs appeal the grant of summary judgment for the first series of shots, and the defendants appeal the denial of summary judgment for the second. The majority opinion concludes that neither series of shots violated the Fourth Amendment.  I cannot agree.  I believe both series of shots violated the teenagers' clearly established Fourth Amendment rights, so I would reverse the grant of summary judgment for the first series of shots and uphold the denial for the second.[3]  And not only do I believe the majority opinion is wrong, but I worry that it sets a dangerous standard for police use of force.

## II.    DISCUSSION

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority."  *Skop*

---

[3] The parties agree that if Brown is not entitled to qualified immunity, he is also not entitled to immunity under state law.  For ease, and because state law immunity rises and falls with the qualified immunity questions, I discuss only the questions of federal law.

*v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). After the official makes this showing—and here it is undisputed—the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). To determine whether a right was clearly established, we look to binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). We ask whether it would be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful," *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted), "in light of the specific context of the case, not as a broad general proposition," *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). In excessive force cases, we determine reasonableness by examining the "totality of the circumstances . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Plumhoff v. Rickard*, 572 U.S. 765, 774–75 (2014) (internal quotation marks omitted). Brown's use of deadly force was specifically circumscribed by our clearly established Fourth Amendment precedent. He therefore is not entitled to qualified immunity.

## A. Fourth Amendment Violation

29

I begin by explaining why I believe Brown's conduct violated the Fourth Amendment. As the majority opinion correctly notes, evaluating the use of deadly force under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Maj. Op. at 12 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted)). To balance those interests, the Supreme Court tells us to weigh whether the officer who used deadly force: (1) had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others, or that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believed that the use of deadly force was necessary to prevent escape; and (3) had given some warning about the possible use of deadly force, if feasible. *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).

The majority opinion focuses exclusively on the first prong of the test: whether Brown had probable cause to believe the driver of the Pontiac posed a threat of serious physical harm to himself or others. Limiting the analysis to the first *Garner* prong, I believe that Officer Brown's use of deadly force was unreasonable under the Fourth Amendment. Applying the entire *Garner* test to the facts of the case only strengthens my conclusion.

30

Beginning with the *Garner* prong the majority analyzes—the threat of serious physical harm—our precedent draws a clear line. "We have applied *Garner* to car chases and have consistently upheld an officer's use of force and granted qualified immunity where the plaintiff used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013) (internal quotation marks omitted). For example, we have held that a car was used as a weapon, justifying the use of deadly force, when a plaintiff drove directly at an officer in the car's path, *e.g.*, *Singletary v. Vargas*, 804 F.3d 1174, 1182–84 (11th Cir. 2015); *Robinson v. Arrugueta*, 415 F.3d 1252, 1254, 1256–57 (11th Cir. 2005); *McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009), and when a fleeing driver in a high-speed chase drove so recklessly as to pose a significant danger to the lives of others, *Pace v. Capobianco*, 283 F.3d 1275, 1281–82 (11th Cir. 2002). "But where the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's use of deadly force." *Morton*, 707 F.3d at 1283.

This case easily falls on the latter side of the line. Christian never used, nor threatened to use, the car as a weapon. Let's begin with the chase: Although he drove at high speeds during the chase, it was around 4:30 a.m., when there was little or, in Brown's words, "zero," traffic. Doc. 48, Ex. G at 6:49. The Pontiac

31

did not come close to any other cars traveling on the road. There is no evidence that any pedestrians were near the road or that Christian drove recklessly or close enough to threaten any occupied structures. He did not threaten the life or safety of any person during the chase; he merely fled from the police who were chasing him. Our precedent is clear that the fact that a suspect flees police, even at a high speed, does not give an officer license to use deadly force. *Morton*, 707 F.3d at 1283; *Vaughan v. Cox*, 343 F.3d 1323, 1330–31 (11th Cir. 2003).

About four minutes after Brown took over the chase, Christian lost control and crashed into the bushes on a deserted road. After crashing, Christian never used or threatened to use the car as a weapon. He did not throw the car into reverse and floor it; he backed up at a normal speed in a straight line. He drove past, not toward, Brown. He was attempting, in the majority opinion's own words, "to evade arrest." Maj. Op. at 14.

The majority opinion fails to engage with our precedent's requirement that a car be used or threatened to be used as a weapon to justify deadly force against a fleeing subject. It maintains that Brown was justified in shooting at the Pontiac's occupants because "[a] reasonable officer in hot pursuit could perceive that the chase was not yet over and that [Christian] would continue to drive recklessly to evade arrest," and "Brown had reason to believe that his life was in danger" because he was "[i]n close proximity to a moving vehicle[] with only seconds to

32

react." *Id.* This reasoning represents a misapplication and substantial extension of our excessive-force precedent.

Turning to the majority's first reason, I disagree that Christian's high-speed driving during the chase provided probable cause for Brown to believe that he needed to use deadly force to stop Christian from injuring him. Driving "recklessly to evade arrest" is not enough to justify shooting the driver.[4] *Id.* Only when a driver drives so recklessly that he transforms his car into a weapon have we held that use of deadly force gets past the Fourth Amendment. For example, in *Pace v. Capobianco*—the case the majority opinion cites for the proposition that reckless driving can justify deadly force—the fleeing driver repeatedly used his car as a weapon during the chase. 283 F.3d at 1277. The driver made a left turn in front of a police car, forcing the officer driving to stop to avoid a collision; swerved his car directly at other police cars coming toward him from the opposite direction; drove through the front yard of an occupied residence at 50–60 miles per hour; nearly hit a civilian motorist while driving on the wrong side of the road; and tried to slam into a police car that was blocking the road. *Id.* These facts led us to conclude that "[b]y the time of the shooting, [the fleeing driver] had used the

---

[4] The majority denies taking the position that the act of fleeing the police recklessly or at high speeds justifies the use of deadly force. *See* Maj. Op. at 18. Yet, in its analysis of why Brown's use of deadly force was objectively reasonable, the majority opinion refers to the high-speed chase no less than six times.

33

automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which [the fleeing driver] was armed." *Id.* at 1282.

Christian's driving did not come close to the level of recklessness and purposeful endangerment that the driver exhibited in *Pace*. He never steered the Pontiac toward any other vehicles or people. He did not run off the road or come close to any civilians before spinning out into some bushes off a deserted road. Unlike the subject's driving in *Pace*, Christian's driving was not so egregious as to indicate to a reasonable officer that he was using or intended to use the car as a weapon.

The majority opinion asserts that the empty roads were "irrelevant to whether Officer Brown reasonably believed" that the Pontiac posed a threat to him. Maj. Op. at 17–18. Not so, according to *Pace*, which instructs that a fleeing driver's behavior—including the extent to which the driver threatens other vehicles, police, and civilians—is relevant to whether an officer had probable cause to believe that a car had become a weapon that threatened the officer. 283 F.3d at 1277. That the roads were empty and Christian did nothing other than flee renders objectively unreasonable a belief based on the chase that the driver of the Pontiac posed an imminent threat to Brown.

34

The majority opinion similarly departs from our precedent with its second reason, that Brown reasonably believed his life was in danger because he was "[i]n close proximity to a moving vehicle[] with only seconds to react." Maj. Op. at 15. But close proximity to a vehicle has never been enough to justify the use of deadly force. The cases the majority opinion cites to support its conclusion condoned the use of deadly force because the suspect drove his vehicle directly at the officer, such that the officer was in immediate danger of being struck. *Singletary*, 804 F.3d at 1183 ("[Surveillance] video establishes that Defendant was in the path of the car when it accelerated" toward him); *Robinson*, 415 F.3d at 1256 (noting that the officer was standing between two vehicles as plaintiff drove toward him and had less than three seconds to "escape before he got crushed"); *see also McCullough*, 559 F.3d at 1208 ("[McCullough] drove the truck towards Antolini's cruiser. Antolini had to quickly jump onto the hood of his police cruiser in order to avoid being hit by McCullough's truck."). Evidence that a plaintiff drove a car *at* an officer is crucial. The act of driving a car in a way that presents an immediate risk of the officer being struck is what turns the car into a weapon and thereby justifies the use of deadly force.

*Singletary* is a paradigm example of the importance of this distinction. In *Singletary,* we considered whether an officer's decision to open fire on a car in a parking lot was objectively unreasonable. The officer was on foot, close to the

35

front of the car.  804 F.3d at 1178.  The case turned on whether the officer was "in the car's path" and "in danger of being hit by the car when he opened fire."  *Id.* at 1178, 1182 (internal quotation marks omitted).  The district court found that the officer was not in danger of being hit and thus denied him qualified immunity.  *Id.*

We agreed with the district court on the governing legal principle, that the officer's use of deadly force would have been reasonable if he was in imminent danger of being struck by the car.  *Id.* at 1181–82.  But we reversed the denial of qualified immunity because the district court's construction of the facts was "blatantly contradicted by the record, so no that reasonable jury could believe it."  *Id.* at 1183 (internal quotation marks omitted).  Video evidence showed that the officer was "clearly . . . in the path of the car when it accelerated."  *Id.* at 1184.  The officer therefore "reasonably fear[ed] for his life" and the "use of deadly force to stop what appeared to be an imminent threat to his life was not excessive."  *Id.* at 1183–84.  The driver's use of the vehicle as a deadly weapon—accelerating toward an officer in the vehicle's path—was the lynchpin of the analysis that led us to reverse the denial of qualified immunity.  *Id.* at 1184–85.

The majority opinion points out that in *Singletary* we did not say that unless the officer was in the vehicle's path, the use of deadly force always violates the Fourth Amendment.  True enough.  But I have found no case where we held that the use of deadly force was justified where, absent other considerations not

36

relevant here, the officer was not in immediate danger of being hit by the vehicle when he began deploying deadly force.  Perhaps recognizing this, the majority writes that "[t]he Pontiac could have struck [Brown] as it drove past him."  Maj. Op. at 14.  But the record, when construed in the plaintiffs' favor, refutes this assertion.

The majority opinion implicitly acknowledges, as it must based on the summary judgment record, that Christian never aimed the Pontiac at Brown; instead, Christian reversed in a straight line past him.  When the car began to reverse and Brown began to fire, he was five to seven feet behind and two to four feet to the right of the passenger side, between five and eight feet away on the diagonal.  By the time the car came within two to four feet from him—as the plaintiffs' expert testified based on the location of the bullet casings—Brown was moving parallel to the vehicle as it passed him, his bullets entering the passenger side window.  According to the plaintiffs' expert, the Pontiac could not possibly have swerved to hit him, and he was never in harm's way.

The majority relies on a footnote in *Long v. Slaton* to assert that an officer need not be in the direct path of the suspect's car because it is "obvious" that a suspect could quickly turn his steering wheel and accelerate toward the officer.  Maj. Op. at 15 (quoting *Long v. Slaton*, 508 F.3d 576, 581 n.7 (11th Cir. 2007)).  What *Long* actually says is that the suspect could have hit the officer by "quickly

37

shift[ing] gears and accelerat[ing] toward" the officer standing in a driveway as Long, who had taken the officer's police car, backed down the driveway away from him. *Long*, 508 F.3d at 581 n.7. Had Long suddenly shifted gears, the officer would have been directly in the path of the oncoming vehicle.[5] In the case before us, though, the majority's supposition that Christian could suddenly have changed direction and hit Brown is contrary to the record and the laws of physics. Based on the position of the Pontiac as it drove past Brown, it would have had to move sideways to strike him, something cars cannot do.

I agree with the majority opinion that "the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." Maj. Op. at 16 (internal quotation marks omitted). Yet the majority opinion does not take account of all the facts that a reasonable officer in Brown's position would have had to frame his perspective. The majority opinion supposes that Brown had no

---

[5] Long was having a psychotic episode when he stole the officer's police car and began to drive away. *Long*, 508 F.3d at 578–79. *Long* sheds little light on this case because in *Long* we said, "[e]ven if we accept" that the threat Long posed to the officer was not immediate, the "threat posed by Long's condition," his "unstable frame of mind, energetic evasion of the deputy's physical control, [his] criminal act of stealing a police cruiser, and [his] starting to drive—even after being warned of deadly force—to a public road gave the deputy reason to believe that Long was dangerous." *Id.* at 581–82; *see also id.* at 581 ("Different from other vehicles, this fully marked and fully equipped police cruiser had an even greater potential for causing—either intentionally or otherwise—death or serious bodily injury."); *id.* at 582 ("In many cases, people have stolen police vehicles and used them to engage in further criminal conduct or otherwise to harm *innocent* people." (collecting cases)). I also note that the officer's warning to Long before using deadly force also played a role in our decision. *Id.* at 583.

38

way of knowing that the Pontiac could not have hit him, but it points to no specific facts to explain why a fear of being hit was objectively reasonable given its trajectory.  It leans heavily on the plaintiffs' expert's estimation that the Pontiac came within two to four feet of Brown—but it ignores that this was as the car *passed* him.  And it ignores that Brown began shooting into the rear window before the car passed him, when he was farther away and it was backing up in a straight line while he stood to the side.[6]

When we view the record in the light most favorable to the plaintiffs, we can reach only one conclusion:  that a reasonable officer in Brown's position would not have believed he was in immediate danger of being struck by the Pontiac if he did not shoot the driver.  Neither Christian's driving prior to the crash, nor his attempt to evade arrest by reversing past Brown, nor Brown's location close to the side of the car turned the car into a weapon.  Under our precedent, then, Brown's decision to fire the first series of 11 shots into the Pontiac was objectively unreasonable.

The notion that the Pontiac posed a threat to Brown is even more farfetched when it comes to the second round of shots.  The Pontiac was much farther away

---

[6] The majority quotes *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), to argue that Brown had "no reason to trust that [the driver] would not suddenly attempt to do him harm." Maj. Op. at 16 (internal quotation marks omitted) (alteration in original).  But *Jean-Baptiste* dealt with a violent suspect, fleeing on foot and armed with a gun. *Id.* at 819, 821.  An officer confronting a violent suspect armed with a gun is in a vastly different situation than one approaching a non-violent driver backing up in an apparent attempt to evade arrest.

from Brown when it stopped on the other side of the road.  The car had just backed slowly past Brown in a straight line and come to a gentle stop.  The driver had not tried to hit him.  Hannah can be heard clearly on the dash cam recording screaming that she had been shot and pleading for Brown to stop shooting.  Yet Brown was reloading while facing the front of the car and walking toward it.

Aside from the fact that only seconds elapsed between the first set of shots and the second, the majority opinion offers no convincing justification for Brown's decision to approach the Pontiac, reload, and continue shooting.  The majority opinion rationalizes that "[a] reasonable officer who had nearly been struck by a suspect's moving vehicle could perceive that the vehicle, with its engine still running and its headlights still shining as it faced him, remained a dangerous weapon that continued to pose a threat until the driver was fully secured."  Maj. Op. at 19.  The majority might be right if Christian had in fact nearly hit Brown or there was some indication that Christian meant to harm Brown after backing the car past him.  But taking the record in the light most favorable to the plaintiffs, as we must on summary judgment, that is not what happened.  And no reasonable officer who perceived he was in imminent danger of being struck by a car would have advanced toward the car like Brown did.  The fact that Brown approached the car from the front helps to inform us on whether an officer in his position

40

reasonably would have believed he was in imminent danger of being struck by the car.[7] He would not.

The majority opinion counters that Brown had a "duty" to approach the Pontiac as he did—putting himself directly in front of the car that the majority says he reasonably feared would suddenly shift gears and accelerate toward him—in order to protect the public by arresting the driver. Maj. Op. at 20. But this rationale, protection of the public, rests on a similarly faulty premise: that at the point when Brown began to follow the car across the road, there was probable cause to believe the driver posed a threat of harm to the public so serious that Brown had to use deadly force to stop him. Absent such a threat, the use of deadly force to effect an arrest is unconstitutional. *Garner*, 471 U.S. at 11.

Having dispensed with the notion that the Pontiac posed a serious threat to Brown during either series of shots, I now move to the next prong of the *Garner* test: whether the use of deadly force was necessary to prevent escape. Here again, the answer is no. Brown followed the Pontiac for several miles and would have been able to describe it to other officers. And with few or no other cars on the road, the Pontiac would have been easily identifiable to Brown or any other police

---

[7] To the extent that Brown unnecessarily created this danger himself, we should not condone his use of deadly force simply because he placed himself in a dangerous position. *See Young v. Borders*, 850 F.3d 1274, 1300 (11th Cir. 2017) (Jill Pryor, J., dissenting from the denial of rehearing en banc) ("When police unilaterally manufacture alarm and urgency that the situation at hand clearly does not warrant, the law does not—and must not—grant them qualified immunity for a deadly split-second decision.").

officer who joined the chase. *See Vaughan*, 343 F.3d at 1331. Although "[i]t is no doubt unfortunate when a suspect who is in sight escapes," an officer is not justified in using deadly force to prevent escape when the suspect does not pose a great danger to others. *Garner*, 471 U.S. at 11. Given that Brown could not reasonably have believed Christian posed such a danger, the use of deadly force to prevent escape was unlawful.

The third prong of the *Garner* test—whether Brown could have given a warning before beginning to shoot—also indicates that Brown's use of deadly force was unreasonable. Brown began shooting within three seconds of exiting his police vehicle. The Pontiac was moving straight back, not toward him. He could have yelled for Christian to stop before beginning to fire, but he gave no warning or command. Brown had even greater opportunity to warn the Pontiac's occupants before the second series of shots, but he did not. Instead, he chose to walk toward the Pontiac and continue shooting, even as Hannah screamed for him to stop. That Brown chose to continue using deadly force, rather than give a warning or command, weighs against any notion that his actions were reasonable.

Applying the *Garner* test to the totality of the circumstances, an objectively reasonable officer in Brown's position would not have believed that use of deadly force was necessary. The evidence viewed in the light most favorable to the plaintiffs shows that Brown was not in the Pontiac's path and Christian had not

42

used or threatened to use the Pontiac as a weapon. Absent weaponization—such as driving a car directly at an officer or another person—an officer's use of deadly force is unreasonable, even if it follows a high-speed car chase. *Morton*, 707 F.3d at 1283; *Vaughan*, 343 F.3d at 1330–31. The use of deadly force also was not necessary to prevent the Pontiac from evading eventual arrest because Brown had all the information he needed to locate the Pontiac again or to radio to other officers for assistance. And there was no reason to believe Christian or the other occupants were so dangerous that they had to be prevented from escaping to stop them from harming others. Finally, although the action transpired quickly, Brown's failure to warn the plaintiffs before using deadly force against them—say, just as the backup lights came on—was objectively unreasonable, too.

Brown's conduct fails the *Garner* test and flies in the face of our precedent requiring a car to be used or threatened to be used as a weapon before an officer may employ deadly force. I would hold that Brown's conduct violated the teens' Fourth Amendment rights.

## B.  Clearly Established Law

Brown's decision to shoot into the Pontiac violated Hunter's, Hannah's, and Christian's Fourth Amendment rights. But for plaintiffs to overcome the bar of qualified immunity, Brown's conduct must also have violated clearly established law. There is no question that it did.

43

The same cases that should lead us to conclude Brown violated the teenagers' constitutional rights also clearly established the applicable law. On the night of the shooting, our precedent clearly established that when a driver "d[oes] not use or d[oes] not threaten to use his car as a weapon," an officer may not use deadly force to stop him. *Morton*, 707 F.3d at 1283. It was also clearly established that leading police on a high-speed chase in and of itself does not justify the use of deadly force. Instead, a driver must pose a threat of serious physical harm to the officer or another before the use of deadly force is justified. *Garner*, 471 U.S. at 11; *Morton*, 707 F.3d at 1283; *Pace*, 283 F.3d at 1277, 1281–82. Because Brown could not have had an objectively reasonable belief that the Pontiac posed a threat of serious physical harm to himself or others, he violated the teens' clearly established rights when he fired into the car. I would reverse the district court's denial of qualified immunity on the first series of shots and uphold its denial of qualified immunity on the second series of shots.

*     *     *

Before I conclude, there are two aspects of the majority opinion that merit additional comment. First, I am very troubled that the majority sees fit to discuss such things as Hunter's juvenile records and criminal charges, the two boys' previous drug use, Hannah's parenting, and Christian's statements outside the hearing of any officer, all of which are entirely irrelevant to the Fourth

44

Amendment analysis.  There is no evidence in the record that Brown or any other investigating officer knew of this inflammatory information, other than Levins's comment that Hannah had left her baby in the house with him, which was no cause for the use of force.  So, the information could not have influenced the decision to shoot into the car.  The majority's inclusion of these details implies that the teens somehow had a lesser Fourth Amendment right to be free from the unreasonable use of deadly force because of them—which is appallingly untrue.

Second, I want to highlight that the majority opinion is not just incorrect in this case but also has the potential to excuse the unconstitutional use of force by police in the future.  The majority opinion justifies Brown's use of force by pointing to Christian's high-speed driving during the chase and Brown's proximity to the Pontiac as it reversed.  I fear that the majority opinion sanctions the use of deadly force when after a car chase an officer on foot approaches a vehicle and the driver attempts to flee, even if the officer is not in the vehicle's path and has no probable cause to believe the driver will use the vehicle as a weapon.[8]  Time and

---

[8] The majority opinion contradicts not only our precedent, but also police best practices. As the plaintiffs' expert on police use of force noted in his report, "[m]any, if not most departments have developed policies prohibiting [officers from shooting into moving vehicles]." Doc. 41-8 at 12.  Since 2014, the Georgia Association of Chief of Police model policy has stated that firearms "should not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening an officer or another person with deadly force by means *other than the vehicle*." *Id.* at 13 (emphasis added).  The Georgia Department of Public Safety has had the same prohibition since 2015.  To be clear, I am not suggesting that police policies establish the law.  They do not.  But these policies can inform our understanding of what a reasonable officer would do in a given situation—key to the analysis required by *Garner*. *See Stamps v. Town of*

again—for good reason—our precedent has rejected the rationale the majority

opinion adopts today.  I dissent.

---

*Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016) (police training and procedures "do not, of course, establish the constitutional standard but may be relevant to the Fourth Amendment analysis."); *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although . . . training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable.").