[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11902

_____

VERONICA BAXTER,
as Personal Representative of the
Estate of Angelo J. Crooms, Deceased,

                              Plaintiff-Counter Defendant-Appellant,

AL-QUAN PIERCE,
as Personal Representative of the
Estate of Sincere Pierce, Deceased,

                                        Plaintiff-Appellant,

*versus*

JAFET SANTIAGO-MIRANDA,
individually and as an agent of
Brevard County Sheriff's Office,

Defendant-Counter Claimant,

CARSON HENDREN,
individually and as an agent of
Brevard County Sheriff's Office,
SHERIFF, BREVARD COUNTY FLORIDA,
EVELYN MIRANDA,
as Personal Representative of the
Estate of Jafet Santiago-Miranda,

Defendants-Counter Claimants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-00718-CEM-LHP

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit Judges.

HULL, Circuit Judge:

This appeal involves a fatal shooting in which Deputy Jafet Santiago-Miranda fired his weapon into a moving vehicle as it accelerated toward him and tragically killed two young persons.

Plaintiffs Veronica Baxter and Al-Quan Pierce sued as personal representatives of the estates of the driver, Angelo Crooms, and a passenger, Sincere Pierce, respectively. The plaintiffs' complaint asserted that Santiago-Miranda used excessive force, failed to render medical aid, and was liable for state-law battery. The plaintiffs' complaint also raised claims against Deputy Carson Hendren, who was the other deputy on the scene, and Sheriff Wayne Ivey in his official capacity.

The three defendants filed a joint motion for summary judgment on all claims. In their response, the plaintiffs opposed summary judgment and further stated they had decided not to pursue certain claims. In a single order, the district court dismissed with prejudice all claims against defendant Hendren and granted Santiago-Miranda and Sheriff Ivey's motion for summary judgment. The court concluded, among other things, that defendant Santiago-Miranda's use of force was constitutionally permissible. The plaintiffs appeal only the grant of summary judgment in favor of defendants Santiago-Miranda and Sheriff Ivey.

After careful review of the record and briefs, and with the benefit of oral argument, we affirm. We divide our discussion into four parts. First, we examine our appellate jurisdiction because this case was adjudicated in the district court through a voluntary dismissal of defendant Hendren and a summary judgment grant as to defendants Santiago-Miranda and Sheriff Ivey. Second, satisfied that we have jurisdiction, we determine whether Santiago-Miranda's use of force was excessive in violation of the

plaintiffs' constitutional rights under the Fourth Amendment. Next, we review the plaintiffs' state law battery claims and, finally, their *Monell* claims against Sheriff Ivey.[1]

## I. BACKGROUND

We recount the evidence of the events in the light most favorable to the plaintiffs, the non-moving parties. *See Cantu v. City of Dothan*, 974 F.3d 1217, 1228 (11th Cir. 2020). Some events were captured on defendant Santiago-Miranda's dashcam in his cruiser.[2]

### A. The Stolen VW Passat

Around 10:15 a.m. on November 13, 2020, Deputy Ezra Dominguez with the Brevard County Sheriff's Department was patrolling the parking lot of a hotel in Cocoa, Florida when he observed a gray or silver Volkswagen Passat with illegal dark tint on all windows. Dominguez noticed a man acting suspiciously near the Passat. A few minutes later, the Passat pulled out of the hotel parking lot, and Dominguez followed it.

Deputy Dominguez turned on his blue lights and attempted to conduct a traffic stop on the Passat, but the vehicle did not stop and drove away at an increasing rate of speed. Dominguez

---

[1] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

[2] The dashcam video was enhanced by the Florida Department of Law Enforcement ("FDLE") to more closely show the deputy and the moving vehicle. On appeal, the plaintiffs do not challenge the admissibility of the dashcam video. Deputy Hendren did not activate her dashcam.

terminated the traffic stop and reported the Passat's description over the dispatch radio.

At about 10:30 a.m., a woman reported that her silver Volkswagen Passat with license plate number NWEG22 was stolen. The stolen Passat was registered to an address in Brevard County. The dispatch radio reported Dominguez's attempted traffic stop and the stolen Passat.

## B. Deputies Pursue a VW Passat

Deputies Jafet Santiago-Miranda and Carson Hendren, also with the Brevard County Sheriff's Department, received information over the dispatch radio about the stolen Passat that fled from Deputy Dominguez. After receiving Dominguez's description of the Passat, Santiago-Miranda and Hendren, in their separate cruisers, met in a liquor store's parking lot on the corner of Clearlake Drive and Dixon Boulevard in Cocoa. Both deputies were in full police uniform, and each drove a marked police cruiser.

At that juncture, approximately 15 minutes after hearing the dispatch radio, Deputy Hendren, from the parking lot, observed a gray Volkswagen Passat, which also had illegal dark tint on the windows, turn quickly onto Dixon Boulevard and speed away. In their separate cruisers, Santiago-Miranda and Hendren then followed that Passat down Dixon Boulevard and into a residential neighborhood. Hendren's cruiser followed the Passat on one street through the neighborhood. Santiago-Miranda's cruiser went down another street in the neighborhood. Neither deputy activated their lights or sirens.

Both deputies thought this Passat was the stolen Passat that eluded Deputy Dominguez's attempted stop about 15 minutes earlier.  In this Passat, 16-year-old A.J. Crooms was driving, and his friend Jaquan Kimbrough-Rucker was in the front passenger seat. Crooms stopped at Cynthia Green's house on Exeter Street to pick up Sincere Pierce, who was Green's 14-year-old great-nephew. Pierce entered the Passat and sat in the middle of the backseat behind driver Crooms's right shoulder.

When the Passat drove off, Green saw from her house a sheriff's deputy vehicle following the Passat.  Green got in her car and began to follow the deputy's vehicle.

After picking up Pierce at Green's house, Crooms in the Passat turned left from Exeter Street onto Ivy Drive.  Deputy Hendren turned onto Ivy Drive a few seconds later, and Deputy Santiago-Miranda accelerated to fall in behind Hendren's cruiser. With both deputies' cruisers now directly behind, Crooms drove the Passat down Ivy Drive and turned left onto Stetson Drive. After that left turn, Crooms immediately turned right into the driveway of the first house on the right on Stetson Drive.

Deputy Hendren also turned left onto Stetson Drive but stopped her cruiser in the middle of the street and got out of her cruiser with her gun drawn.  Hendren reported the Passat's license plate number—NWEG04[3]—to dispatch, but received no response.

_____

[3] Since the stolen Passat's number was NWEG22, the first four characters in both license plate numbers—NWEG—were the same.

23-11902                Opinion of the Court                7

Deputy Santiago-Miranda also turned left onto Stetson Drive, pulled up his cruiser to the left of Hendren's cruiser, and stopped. Santiago-Miranda activated his cruiser's overhead emergency lights but did not activate the sirens. At this point, the deputies' two cruisers were parked side-by-side on Stetson Drive. The photograph below shows the cruisers blocking the entrance/exit of Stetson Drive with Santiago-Miranda's cruiser on the right.



At this time, the Passat is still in the driveway of the first house on the right on Stetson Drive.

## C. Santiago-Miranda Orders Driver to Stop

Santiago-Miranda's dashcam captured the following events. The dashcam shows the Passat backing out of the driveway of the first house on the right of Stetson Drive.



Backing out, the Passat did not turn its rear toward the cruisers (which would allow it to continue down the open direction of Stetson Drive). What happened next gives rise to the shooting.

As shown in the photograph below, Crooms backed out and turned the front of the Passat directly facing the two deputies and their cruisers.



With the Passat turned toward the deputies, Hendren raised her gun and retreated behind her cruiser. Santiago-Miranda exited his cruiser. Standing at the left side of his cruiser, Santiago-Miranda issued a command for Crooms to "stop the vehicle!" The above photograph depicts the scene at 1:06 on the dashcam.

At 1:08, the Passat started slowly moving forward. Santiago-Miranda issued a second command for Crooms to "stop the vehicle!" At 1:10, the Passat stopped moving. The Passat was still facing both cruisers, but was now pointed more closely toward Santiago-Miranda and his cruiser. Santiago-Miranda issued a third command for Crooms to "stop the vehicle!" From 1:11 to 1:14, the Passat did not move. Santiago-Miranda, with increasing volume and intensity, issued a fourth command to "stop the vehicle!" and a fifth command to "stop!"

After the five commands to stop, however, Crooms at 1:15 started reversing the Passat again, now pointing the Passat's front directly toward Santiago-Miranda's cruiser. Santiago-Miranda announced code 1033 to the dispatch radio to signal an emergency and request all radio traffic to cease. At 1:16, the Passat was still reversing. Santiago-Miranda approached the Passat from the left side of his cruiser with his gun pointed at the Passat. Santiago-Miranda gave a sixth command to "stop the vehicle, god damn it," and took a slight step to his right, closer to his cruiser.

At 1:17, the Passat stopped reversing. The front of the Passat was now pointed toward Santiago-Miranda and his cruiser. While stopped, Crooms begins turning the Passat's wheels slightly to his right and more toward Santiago-Miranda. Santiago-Miranda issued a seventh command to "stop!" The photograph below shows the positioning of the Passat at this point at 1:17.



**D. As Passat Accelerates, Santiago-Miranda Fires Weapon**

At 1:18-1:19, these next events rapidly occurred in two seconds. At 1:18, Crooms turned the Passat's wheels further to his right, in the direction where Santiago-Miranda was standing on the

curb or near the curbside.  Santiago-Miranda issued his eighth and final command to "stop!"  Instead of stopping, Crooms accelerated the Passat forward directly toward Santiago-Miranda.

Simultaneously, Santiago-Miranda took a short step to his left, and the Passat still accelerated forward toward Santiago-Miranda.  The photograph below depicts the scene at this point with Santiago-Miranda about ten feet away from the front bumper of the Passat with its wheels turned further to the right.



Then, at 1:19, the Passat was still accelerating at Santiago-Miranda, who began to fire his gun at the Passat.  Within 2.1 seconds, Santiago-Miranda rapidly fired 10 shots with each shot fired at an average of only 0.236 seconds apart.

When Santiago-Miranda fired his first shot, the Passat had closed to a distance of 9.05 feet away.  Because of the Passat's acceleration, the Passat was 6.06 feet away at Santiago-Miranda's second shot and 5.74 feet away at his third shot.[4]  At the time of

---

[4] These undisputed distance figures were presented in the defendants' expert report, filed with their motion for summary judgment.

this initial rapid firing, the Passat was directly headed toward Santiago-Miranda as shown in the photograph below.



The entry place of the 10 shots within 2.1 seconds also reflects the Passat's acceleration. The first two shots entered into the center of the front windshield and hit the hood of the Passat. As the Passat accelerated forward, the next three shots struck the windshield further to Santiago-Miranda's right. The final five shots entered into the driver's side windows as the vehicle accelerated over the curb and off of Stetson Drive onto a yard, passing Santiago-Miranda on his left.

The Passat's accelerator was completely depressed as it accelerated forward, and from a full stop, the Passat reached a maximum speed of 14 miles per hour before crashing into a house. Deputy Hendren kept her firearm pointed at the Passat while using both police cruisers as cover. Green parked her car behind the cruisers, got out, and observed the shooting from about ten feet behind and to the left of Santiago-Miranda.

A forensic analysis revealed that Santiago-Miranda's first shot likely struck the middle of the Passat's front windshield,

deflected slightly downward, and struck Pierce, the backseat passenger, in the chest. Santiago-Miranda's seventh, eighth, and ninth shots entered the driver's side window and likely struck Crooms in his head, shoulder, and back. Pierce and Crooms later died from their gunshot wounds.[5]

## II. PROCEDURAL HISTORY

### A. Complaint

The plaintiffs' operative amended complaint contained ten counts; specifically, each plaintiff asserted five of the ten counts.

Plaintiff Baxter asserted two counts against defendant Santiago-Miranda[6]: Count One combined together excessive force and failure to render emergency medical aid claims under 42 U.S.C. § 1983; and Count Two contained state-law battery claims. Plaintiff Baxter asserted one count against defendant Hendren: Count Three combined together failure to intervene and failure to render emergency medical aid claims under § 1983.

Plaintiff Baxter also asserted two counts against defendant Sheriff Ivey: Count Four for deliberate indifference in training and Count Five for deliberate indifference in retention under *Monell*.

---

[5] The accelerator data comes from FDLE's investigative report. The speed data and shot entries come from the plaintiffs' expert report. This data is not disputed.

[6] During the course of the proceedings in the district court, Santiago-Miranda died. Evelyn Miranda, the personal representative of Santiago-Miranda's estate, was substituted as a defendant.

Plaintiff Pierce asserted separately the same claims against the same two deputies and the Sheriff in Counts Six through Ten.

## B. Summary Judgment Proceedings

The three defendants jointly moved for summary judgment on all claims. The defendants asserted that (1) Santiago-Miranda's use of force was reasonable, (2) Santiago-Miranda and Hendren rendered emergency medical aid, (3) Hendren had no meaningful opportunity to intervene, (4) both deputies were entitled to qualified immunity, and (5) the plaintiffs' *Monell* claims against Sheriff Ivey failed. The defendants requested that their joint motion for summary judgment be granted as to all defendants on all claims.

The plaintiffs' summary judgment response not only opposed summary judgment, but also stated the plaintiffs had decided not to pursue certain claims. We discuss the plaintiffs' response in more detail later.

Ultimately, in its summary judgment order, the district court (1) dismissed with prejudice all claims against defendant Hendren, and (2) granted the defendants' motion for summary judgment. The plaintiffs timely appealed only the summary judgment grant in favor of defendants Santiago-Miranda and Sheriff Ivey.

### III. STANDARDS OF REVIEW

"We review a district court's grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual

inferences, in favor of the nonmoving party." *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022) (quotation marks omitted). We review our jurisdiction *de novo*. *Allen v. AT&T Mobility Servs.*, 104 F.4th 212, 215 (11th Cir. 2024).

## IV. JURISDICTION

This case was adjudicated in the district court through a voluntary dismissal as to defendant Hendren and a summary judgment grant as to defendants Santiago-Miranda and Sheriff Ivey. How a party drops a claim or a defendant can trigger appellate jurisdictional issues. So, as a threshold matter, we are obligated to ensure we have jurisdiction. *Id.* We review the relevant jurisdictional principles and apply them to this case.

## A. Jurisdictional Principles

Generally, our jurisdiction is limited to "final decisions of the district courts."[7] 28 U.S.C. § 1291. "A final decision is typically one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment." *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 986 (11th Cir. 2022) (quotation marks omitted). An order that adjudicates fewer than all the claims against all the parties to an action is typically not a final judgment from which an appeal may be taken. *Sargeant*, 689 F.3d at 1246.

---

[7] "There are exceptions to th[is] final judgment rule," but none of the exceptions apply here. *Supreme Fuels Trading FZE v. Sargeant*, 689 F.3d 1244, 1245 n.1 (11th Cir. 2012).

To explain the potential finality issue, we review Rules 41(a) and 15, the Federal Rules of Civil Procedure that provide several options for when parties want to dismiss claims or defendants.

Under Rule 41(a)(1), a plaintiff—without a court order—may dismiss an "action" by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment," FED. R. CIV. P. 41(a)(1)(A)(i), or "a stipulation of dismissal signed by all parties who have appeared," FED. R. CIV. P. 41(a)(1)(A)(ii). Alternatively, under Rule 41(a)(2), a plaintiff may also seek dismissal of an "action" "by court order" on terms that the court considers proper. FED. R. CIV. P. 41(a)(2).

Rule 41(a) applies to "actions," not claims. *See Esteva v. UBS Fin. Servs. Inc. (In re Esteva)*, 60 F.4th 664, 675 (11th Cir. 2023). "Rule 41(a)'s reference to the voluntary dismissal of 'an action' refers to 'the whole case' instead of particular claims." *Id.*; *see also Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018) ("There is no mention in the Rule of the option to stipulate dismissal of a portion of a plaintiff's lawsuit—*e.g.*, a particular *claim*—while leaving a different part of the lawsuit pending before the trial court."). Thus, under Rule 41(a), a plaintiff may dismiss only an entire action. *In re Esteva*, 60 F.4th at 677.

Further, "in a multi-defendant lawsuit, an 'action' can refer to all the claims against one party." *Rosell v. VMSB*, 67 F.4th 1141, 1144 n.2 (11th Cir. 2023). Therefore, under Rule 41(a), a plaintiff may dismiss an "action" against a single defendant—that is, all

claims against that defendant.  *See id.*; *In re Esteva*, 60 F.4th at 677; *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004).

Now comes the pitfall.  A plaintiff may not use Rule 41(a) to dismiss a single or discrete claim against a single defendant or against all defendants. *In re Esteva*, 60 F.4th at 677.  Rule 41(a) "does not permit plaintiffs to pick and choose, dismissing only particular claims within an action." *Id.*; *see also Klay*, 376 F.3d at 1106. "Our precedent has been consistent on this point for almost two decades."  *Rosell*, 67 F.4th at 1144.  This limitation applies to dismissals under both Rule 41(a)(1) and Rule 41(a)(2).  *Id.*  As a result, a Rule 41(a) dismissal of only one of the claims against a defendant or defendants is ineffective and leaves that claim pending in the district court, creating a lack of finality.  *See id.*

Plaintiffs who no longer wish to pursue a claim have other avenues to drop or abandon that claim. For example, one procedural option is Rule 15.  A plaintiff may move to amend the complaint to add or drop a discrete claim or a defendant under Rule 15. *See* FED. R. CIV. P. 15(a)(2); *Perry*, 891 F.3d at 958.  Rule 15 is the "easiest and most obvious" way to "dismiss a single claim without dismissing an entire action."  *Perry*, 891 F.3d at 958. Rule 15 permits an amendment to the pleadings upon permission from the opposing party or the court's leave, and it states that "[t]he court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a)(2).  "A plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) rather than dismiss under Rule 41(a)."  *Klay*, 376 F.3d at

1106; *see also Perry*, 891 F.3d at 958 ("Rule 15 was designed for situations like this."). Of course, if a plaintiff chooses not to amend his complaint, he may instead concede a claim in the district court. *Cf. Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (deeming claim abandoned and affirming grant of summary judgment as to claim presented in complaint but not raised in plaintiff's initial response to summary judgment motion); *Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (noting that the district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"). Although that route will result in the entry of judgment on that claim against the plaintiff, this kind of concession, like a Rule 15 amendment, avoids any finality problems.

When a party attempts to drop a claim or a defendant without citing one of the rules, or when a party's language is ambiguous, our Court has construed a party's attempt in accordance with the appropriate rule. *See, e.g.*, *Lowery v. AmGuard Ins. Co.*, 90 F.4th 1098, 1102–03 (11th Cir. 2024) (concluding plaintiff's "notice of intent to abandon" a count functioned as proper Rule 15 motion); *Mid City Mgmt. Corp. v. Loewi Realty Corp.*, 643 F.2d 386, 388 n.2 (5th Cir. Unit A Apr. 1981) (holding no finality problem resulted where "the defendant actually abandoned its

18                    Opinion of the Court                    23-11902

counterclaim at trial in response to questioning by the trial judge").[8]

Similarly, when a district court interprets a party's attempt to drop or concede a claim, we construe that interpretation to align with the law. "Trial judges are presumed to know the law and to apply it in making their decisions." *Burrell v. Bd. of Trs. of Ga. Mil. Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997) (quotation marks omitted). Where ambiguous or not fully explained, we construe the district court's words to support a lawful judgment. *Id*.

## B. Analysis

We turn to what happened here. The plaintiffs' summary judgment response not only opposed summary judgment, but also stated in Section V that the plaintiffs had decided not to pursue certain claims. Here is the heading and entire text of Section V of the plaintiffs' summary judgment response:

> **V.    Plaintiffs dismiss their claims for failure to render medical aid against Deputy Santiago and Hendren (part of Counts 1, 3, 6, and 8) and failure to intervene against Deputy Hendren (part of Counts 3 and 8)**
>
> Plaintiffs have decided not to pursue their claim based on failure to render emergency medical aid. In addition, Plaintiffs have decided not to pursue their

---

[8] This Court adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

23-11902              Opinion of the Court              19

> claim for failure to intervene against Deputy Carson
> Hendren, which results in a dismissal of Plaintiffs'
> claims against Deputy Hendren.

Section V's heading referred to dismissal of the medical aid claims against both named deputies, but the text's dismissal request is for "a dismissal of Plaintiffs' claims against Deputy Hendren." Section V did not cite Rule 41(a) or Rule 15. What's more, the plaintiffs did not file a separate motion to dismiss. What was thus before the district court was (1) the defendants' joint motion for summary judgment, and (2) the plaintiffs' summary judgment response opposing summary judgment but also containing Section V.

Here's how the district court addressed the defendants' motion and the plaintiffs' response. Early in its summary judgment order, the district court construed the plaintiffs' request in Section V as a Motion for Voluntary Dismissal under Rule 41(a)(2) as follows:

> In Plaintiffs' Response to Defendants' Motion for
> Summary Judgment, Plaintiffs state that they are no
> longer pursuing their claims for failure to render
> medical aid as to either of the deputies nor are they
> pursuing any of their claims against Hendren. The
> court construes this announcement as a Motion for
> Voluntary Dismissal pursuant to Federal Rule of Civil
> Procedure 41(a)(2), which will be granted.

In the conclusion of that summary judgment order, the district court then granted that construed Motion and "Defendants' Motion for Summary Judgment" as follows:

> 1. Plaintiffs' construed Motion for Voluntary Dismissal (Doc. 96 at 53) is **GRANTED**. The claims against Defendant Carson Hendren are **DISMISSED with prejudice**.
>
> 2. Defendants' Motion for Summary Judgment (Doc. 62) is **GRANTED**.

The district court then directed the clerk to "enter judgment in favor of [Sheriff Ivey] and [Deputy Santiago-Miranda]."

A potential finality issue arises because Rule 41(a)(2) allows a party to voluntarily dismiss all claims against a defendant (such as Hendren) but would not permit a party to dismiss, even voluntarily, a single or discrete claim against a defendant (such as the discrete medical aid claim against Santiago-Miranda). *See In re Esteva*, 60 F.4th at 677; *Klay*, 376 F.3d at 1106; *Rosell*, 67 F.4th at 1144 n.2. If the district court dismissed the medical aid claim against Santiago-Miranda under Rule 41(a)(2), then that is not permissible and that medical aid claim against Santiago-Miranda remains pending in the district court. *See Rosell*, 67 F.4th at 1144. But if the district court dismissed with prejudice all claims against Hendren and granted summary judgment on all claims against Santiago-Miranda, then no claims remain pending against Santiago-Miranda and the judgment is final.

Helpfully, the district court's decretal language is divided into two parts. The decretal language, reasonably read, makes clear that the district court in the order's Part (1) dismissed with prejudice only the claims against defendant Hendren, and then in Part (2) granted defendant Santiago-Miranda's motion for summary judgment as to the plaintiffs' claims. Indeed, Part (1) does not mention defendant Santiago-Miranda but expressly refers to dismissal of the plaintiffs' claims as to only defendant Hendren. This is what Rule 41(a)(2) allows. As noted above, "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Burrell*, 125 F.3d at 1395 (quotation marks omitted). We presume the district court knew that it was not permitted to dismiss a single claim, such as the plaintiffs' medical aid claim against Santiago-Miranda, under Rule 41(a)(2). We decline to read into Part (1) a dismissal of the medical aid claim against Santiago-Miranda, who is not mentioned in the decretal language in Part (1).

Rather, it is Part (2) of the decretal language that adjudicates the plaintiffs' claims against Santiago-Miranda. In Part (2), the district court grants the defendant Santiago-Miranda's motion for summary judgment without limitation. That motion sought summary judgment on all the plaintiffs' claims, including the medical aid claim against Santiago-Miranda. The plaintiffs' decision not to pursue their medical aid claim against Santiago-Miranda was tantamount to abandonment of that claim, entitling the district court to grant Santiago-Miranda summary judgment on the claim. *See Wilkerson*, 270 F.3d at 1322. The

district court accepted the plaintiffs' abandonment and adjudicated all claims against Santiago-Miranda when it entered summary judgment for him.[9]  Given the purely summary judgment posture of the case, the district court's order evinces an intent to *dismiss* the plaintiffs' claims against only Hendren and *enter judgment* on the plaintiffs' claims against defendants Santiago-Miranda and Sheriff Ivey.

In so ruling, we recognize that the district court's order (1) first construes the plaintiffs' Section V announcement as a Motion for Voluntary Dismissal under Rule 41(a)(2) and (2) then, in the first sentence of Part (1)'s decretal language, states that the plaintiffs' Motion for Voluntary Dismissal is granted.  But, as the parties' appellate briefs point out, the text of the plaintiffs' Section V distinguished between their decision "not to pursue" the medical aid claims and their request for "dismissal of Plaintiffs' claims against Deputy Hendren."  Plus, the language in the second sentence of Part (1) actually "dismissed" only "the claims against Defendant Carson Hendren," consistent with that distinction.

At bottom, the two sentences in Part (1) must be read together and not separately—especially since Part (1) nowhere names defendant Santiago-Miranda, much less the medical aid

---

[9] Both the plaintiffs and the defendants submit jurisdiction exists.  Plaintiffs' appellate brief asks us to read their Section V as a concession that summary judgment should be granted on their medical aid claim against Santiago-Miranda, not an attempted Rule 41(a)(2) dismissal as to only the medical aid claim against Santiago-Miranda.  The defendants agree.

claim against him.  We should not ignore the intent of the district court or the parties.

In sum, reasonably read, the district court's order entered a final judgment in this action by (1) dismissing with prejudice the plaintiffs' claims against only defendant Hendren, and (2) entering summary judgment for defendants Santiago-Miranda and Ivey. We have appellate jurisdiction to consider this appeal.  *See* 28 U.S.C. § 1291.

## V. EXCESSIVE FORCE

Satisfied that we have appellate jurisdiction, we turn to whether Deputy Santiago-Miranda used excessive force in violation of Crooms's and Pierce's Fourth Amendment rights.

### A. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

When raising a qualified immunity defense, officers have "the burden to establish that they were acting within their discretionary authority." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022).  If the officers satisfy that burden, then the burden shifts to the plaintiff to establish that (1) "the defendant violated a constitutional right," and (2) "the violation was clearly

established." *Christmas v. Harris County*, 51 F.4th 1348, 1354 (11th Cir. 2022) (quotation marks omitted).

The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The Fourth Amendment's freedom from unreasonable seizures includes the right to be free from excessive force. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).

"In excessive force cases, the first qualified immunity inquiry—i.e., whether a plaintiff's constitutional rights were violated—is governed by the Fourth Amendment's objective reasonableness standard." *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023). In analyzing reasonableness, "we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).

"Although we construe the facts in the light most favorable to the plaintiffs, we determine reasonableness from the perspective of a reasonable officer on the scene at the time the events unfolded." *Tillis ex rel Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) (citation and quotation marks omitted). "Our inquiry does not employ the 20/20 vision of hindsight." *Id.* (quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (providing that reasonableness "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97. It is "reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)).

## B. Vehicle as Deadly Force

Under the *Tennessee v. Garner* factors, deadly force is reasonable when an officer (1) has probable cause to believe that a suspected felon poses a threat of serious physical harm to the officer or others; (2) reasonably believes that the deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible. 471 U.S. 1, 11–12 (1985). This rule covers situations in which (1) an officer believed his life was in danger because a suspect used a vehicle as a weapon against the officer or (2) the suspect's use of the vehicle otherwise presented an immediate threat of serious physical harm. *See McCullough*, 559 F.3d at 1207–08.

Consistently, this Court has upheld an officer's use of deadly force in cases where the officer reasonably believed his life was endangered by a suspect who used or threatened to use his car as a

weapon or where the officer reasonably believed the use of a vehicle presented an immediate threat of serious physical harm. *See Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002); *Robinson*, 415 F.3d at 1255–56; *McCullough*, 559 F.3d at 1207–08; *Singletary*, 804 F.3d at 1182–83; *Tillis*, 12 F.4th at 1299; *Davis v. Waller*, 44 F.4th 1305, 1314 (11th Cir. 2022).

In *Robinson*, this Court held that an officer's use of force was reasonable where the officer shot a suspect who was slowly driving a car toward him from a close distance. 415 F.3d at 1256. The suspect was accelerating at only one to two miles per hour, but the officer was standing just two to four feet away in a narrow space between the suspect's car and another car. *Id.* at 1254, 1256. The officer had only 2.72 seconds to react because of the close distance. *Id.* at 1256. We concluded that a reasonable officer could have perceived the car as a deadly weapon, so the officer had probable cause to believe the suspect posed a threat of serious physical harm by using his car as a deadly weapon. *Id.*

Similarly, in *Singletary*, this Court held that an officer reasonably used deadly force when he shot at a vehicle accelerating toward him. 804 F.3d at 1178, 1183. Surveillance video showed that the officer stood directly in the path of the vehicle and that the vehicle caused the officer to fall to the ground. *Id.* at 1178. Even though the driver applied the brakes at the same moment the officer fired the shots, there was no "issue of fact as to whether any danger had dissipated in the split-second immediately preceding [the officer's] decision to use deadly force." *Id.* at 1183. We also

held that the location of the bullet holes in the side of the car, rather than the front, did not establish that the officer was not in danger of being hit by the car because surveillance video showed that the officer was in the path of the car when it accelerated. *Id.* at 1183–84.

In *Tillis*, after a high-speed chase and a crash of the suspect's vehicle, an officer stepped out of his cruiser to make an arrest. 12 F.4th at 1295. As the officer approached the suspect's vehicle, the vehicle's reverse lights turned on. *Id.* The vehicle suddenly went into reverse and started backing up toward the officer. *Id.* The officer began firing at the vehicle and fired 11 shots through the back windshield and side passenger windows as the car passed him. *Id.* After the chambered round, the officer fired a 10-round magazine and later another 10 rounds. *Id.* This Court concluded that the officer reasonably perceived a lethal threat when the vehicle shifted into reverse. *Id.* at 1299. We explained that "[w]hen an officer is on foot and standing in close proximity to a . . . moving vehicle, [the officer] need not be directly in the vehicle's path to fear reasonably for his life," as the driver could quickly turn the steering wheel toward the officer. *Id.* We emphasized that the officer had no way of knowing whether the vehicle would continue in a straight line or swerve toward him, and the officer "certainly did not have time to calculate angles and trajectories to determine whether he was a few feet outside of harm's way." *Id.*

## C. Analysis

Santiago-Miranda's use of deadly force was reasonable because he had probable cause to believe the Passat's close position and acceleration posed a threat of serious physical harm to him. *See Singletary*, 804 F.3d at 1184.  Although mistaken, Santiago-Miranda and Hendren reasonably believed the Crooms-driven Passat was the same stolen Passat that evaded Deputy Dominguez's traffic stop at a high rate of speed just 15 minutes earlier.  The deputies saw the Passat enter a driveway but then back out, turning to face the deputies and their cruisers head on—as opposed to stopping in the driveway or backing out in the other direction.  Crooms then did not comply with Santiago-Miranda's eight commands to stop the Passat.

Rather, after reversing, Crooms accelerated the Passat toward Santiago-Miranda, who was standing only ten feet away. Santiago-Miranda, on foot, had only a second or two to react. Santiago-Miranda fired all ten shots within 2.1 seconds as the Passat moved within 5.74 feet of him.  Under these particular circumstances, Santiago-Miranda had to make a split-second judgment. *See Graham*, 490 U.S. at 396–97.  It was not unreasonable for Santiago-Miranda to perceive at the time he fired that the Passat was accelerating at him and posed a threat of serious physical harm. *Contra Underwood v. City of Bessemer*, 11 F.4th 1317, 1329–32 (11th Cir. 2021) (explaining that the vehicle was merely idling, officers thought the car was going to stop, officers were safely on the side of the car but continued walking to the front of the car and stopped in front of the car).

This case is similar to *Robinson*, *Singletary*, and *Tillis*. The Passat was accelerating directly toward Santiago-Miranda from a close distance. *See Robinson*, 415 F.3d at 1254; *Singletary*, 804 F.3d at 1183. Santiago-Miranda was standing on foot only ten feet away from the Passat, and thus, he was in a vulnerable position and had only a second or two to react. *See Tillis*, 12 F.4th at 1295. Even from a full stop, the Passat had accelerated to 14 miles per hour and had closed the distance from 10 to 5.74 feet within 1 second. *See id.* Santiago-Miranda "did not have time to calculate angles and trajectories to determine whether he was a few feet outside of harm's way." *Id.* at 1299. Accordingly, Santiago-Miranda's use of force was objectively reasonable because a reasonable officer would have perceived the Passat accelerating directly toward him as a lethal threat.

The plaintiffs resist this conclusion. They argue that Crooms backed up and slowly turned the Passat's wheels to the right in order to go around Santiago-Miranda by going off the street and into the yard of a home. Yet without the benefit of hindsight, nothing indicated that Crooms was positioning the Passat merely to go around Santiago-Miranda and into that yard. Instead, Crooms positioned the Passat to face the deputies, did not obey the eight commands to stop, and accelerated directly toward Santiago-Miranda. In these circumstances, when the Passat accelerated, Santiago-Miranda reasonably perceived the Passat to be driving at him and not around him. Notably, the Passat could have stayed stopped and did not have to accelerate at all. Santiago-Miranda had no reason to expect that the Passat was

accelerating to go around him. Santiago-Miranda had only a second or two to react to the Passat's movements, and he was not required to wait and "hope[] for the best." *See Scott v. Harris*, 550 U.S. 372, 385 (2007).

The plaintiffs also assert that Santiago-Miranda was never in the Passat's path, but the dashcam video establishes otherwise. Moreover, "the relevant question is whether it was reasonable for [Santiago-Miranda] to fear" being hit by the Passat when it started accelerating at him at the close distance shown in the video. *See Tillis*, 12 F.4th at 1299. The dashcam video establishes that it was reasonable for Santiago-Miranda to perceive that the vehicle's acceleration toward him presented an immediate threat of serious physical harm. *See Singletary*, 804 F.3d at 1183.

The plaintiffs point to eyewitness testimony from Green, Kimbrough-Rucker, and Deputy Hendren that, they assert, establishes that because the Passat was trying to go off the street and around Santiago-Miranda, Santiago-Miranda had room to move further to the right away from the Passat rather than stepping to the left toward its path. Even assuming Santiago-Miranda had room to move further to the right, Santiago-Miranda had no reason to expect the accelerating Passat was trying to go around him. Room to move to the right does not establish that *no* reasonable officer could have believed he *was* in danger of serious physical harm. "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir.

2009).    Green, Kimbrough-Rucker, and Hendren each had a different perspective than Santiago-Miranda; none were faced with a vehicle accelerating toward them from ten feet away.

The plaintiffs emphasize that (1) Hendren did not fire her weapon, and (2) their expert testified that no reasonable officer would have perceived an immediate threat justifying lethal use of force.   The fact that Hendren did not fire her weapon does not establish that it was unreasonable for Santiago-Miranda to fire his. *See Davis*, 44 F.4th at 1318 ("More than one course of action can be reasonable – the other officers' decision not to shoot does not render [an officer's] choice unreasonable.").   This is especially true here given the dissimilar locations of the two deputies when the Passat accelerated.   The expert's analysis of the situation is the exact kind of 20/20 hindsight analysis we do not engage in. *See Graham*, 490 U.S. at 396.

The plaintiffs argue that *Tillis* and *Singletary* are distinguishable because both cases involved other dangerous conduct—one a high-speed chase and one a drug bust.   However, the discrete decision to fire in both cases occurred when the vehicle accelerated toward the officer at a close distance. *See Tillis*, 12 F.4th at 1295; *Singletary*, 804 F.3d at 1178, 1183.   The same is true here.

Lastly, the plaintiffs suggest that Deputy Santiago-Miranda's continued shooting into the driver's side window of the Passat as it passed him constituted an independent violation of Crooms's Fourth Amendment rights.   This Court has rejected a request to "sequentially sever" two rounds of shots. *See Davis*, 44 F.4th at

1317–18.  Santiago-Miranda's shots into the Passat's driver's side window are inseparable from his shots into the front windshield. Santiago-Miranda fired all 10 shots within 2.1 seconds. Santiago-Miranda had no realistic opportunity within those brief two seconds to react to the Passat's continued acceleration and to stop shooting.

Even if we could distinguish between Santiago-Miranda's initial shots through the Passat's windshield and his later shots through the side of the Passat, the later shots did not violate Crooms's constitutional rights.  The location of the bullet holes in the side of the Passat does not establish that Santiago-Miranda was no longer in danger of being hit by the Passat.  *See Singletary*, 804 F.3d at 1183–84.  Santiago-Miranda was on foot only a few feet away from the Passat by then, and he could not have known whether the Passat was going to continue on that trajectory or swerve toward him.  *See Tillis*, 12 F.4th at 1299.  In this kind of "tense, uncertain, and rapidly evolving" circumstance, "[w]e are loath to second-guess the decisions made by" Santiago-Miranda. *See Graham*, 490 U.S. at 397; *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003).

Because Deputy Santiago-Miranda did not violate the plaintiffs' constitutional rights, we need not consider the second prong of the qualified immunity analysis.  We affirm the district court's grant of qualified immunity to Santiago-Miranda on the plaintiffs' excessive force claims.

## VI. BATTERY CLAIMS

The plaintiffs also assert that their state law battery claims should be revived for the same reasons that Deputy Santiago-Miranda's use of force was excessive. Since Santiago-Miranda's use of force was not excessive, the plaintiffs' battery claims fail as well.

Under Florida law,

> A law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of *any force* . . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest.

FLA. STAT. § 776.05(1) (emphasis added). "Police officers receive a presumption of good faith . . . as to the use of force applied during a lawful arrest." *Kimbrel v. Clark*, 385 So. 3d 1124, 1128 (Fla. Dist. Ct. App. 2024).

Battery claims for excessive force under Florida law are "analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id.* (quotation marks omitted). This Court has applied the same Fourth Amendment excessive force analysis to a battery claim against an officer under Florida law. *See Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (finding triable issue of fact on Florida battery claim for same reasons as Fourth Amendment excessive force claim).

As we explained above, Santiago-Miranda's use of deadly force was reasonable because the Passat's close position and acceleration posed an immediate threat of serious physical harm to him.  For those same reasons, the district court correctly found that Santiago-Miranda is entitled to summary judgment on the plaintiffs' battery claims.  *See* FLA. STAT. § 776.05(1); *Kimbrel*, 385 So. 3d at 1128.

## VII. *MONELL* CLAIMS

We also affirm the district court's grant of summary judgment to Sheriff Ivey on the plaintiffs' *Monell* claims for deliberate indifference in training and retention.  *See Monell*, 436 U.S. at 692.

To seek damages from Sheriff Ivey in his official capacity, the plaintiffs had to show, *inter alia*, "that [their] constitutional rights were violated." *Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1129 (11th Cir. 2023).  "A *Monell* claim is derivative of—and so requires—an *actual* constitutional violation by an officer." *Id.*

The plaintiffs' *Monell* claims fail because, as explained above, Deputy Santiago-Miranda did not violate their constitutional rights.  Without an underlying constitutional violation, Sheriff Ivey cannot be held liable for deliberate indifference in training and retention.[10]  *See id.*

---

[10] We note that the plaintiffs may have abandoned any objection to the district court's grant of summary judgment to Sheriff Ivey.  In their brief, the plaintiffs mention their *Monell* claims only once in describing the operative complaint

### VIII. CONCLUSION

In conclusion, we have appellate jurisdiction over this appeal. Because Santiago-Miranda's use of deadly force did not violate the plaintiffs' constitutional rights, we affirm the district court's grant of summary judgment to (1) Santiago-Miranda on the plaintiffs' excessive force and battery claims, and to (2) Sheriff Ivey on the plaintiffs' *Monell* claims.

**AFFIRMED.**

---

and once in the concluding sentence. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (explaining that "an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority"). Even affording the plaintiffs the benefit of the doubt that they adequately presented this issue to us, the *Monell* claims fail because Santiago-Miranda did not violate the plaintiffs' constitutional rights.

23-11902                LUCK, J., Dissenting                1

LUCK, Circuit Judge, dissenting:

I completely agree that Deputy Jafet Santiago-Miranda did not use excessive force in violation of the Fourth Amendment, he did not commit a state law battery, and the sheriff was not liable under *Monell*. In other words, I agree with the bulk of the thoughtful and well written majority opinion. But I must respectfully dissent because I don't think the district court's summary judgment order was final, which means we do not have jurisdiction over this appeal. The district court's order was not final because it did not resolve all of the claims against Deputy Santiago-Miranda. *See Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007) ("Ordinarily . . . an order adjudicating fewer than all the claims in a suit . . . is not a final judgment from which an appeal may be taken.").

The plaintiffs alleged three claims against Deputy Santiago-Miranda: a 42 U.S.C. section 1983 excessive force claim; a section 1983 failure-to-render-aid claim; and a state law battery claim. The district court construed the plaintiffs' summary judgment response as a Federal Rule of Civil Procedure 41(a)(2) motion to dismiss voluntarily their failure-to-render-aid claim against Deputy Santiago-Miranda, granted the voluntary dismissal motion, and granted summary judgment for Deputy Santiago-Miranda on the plaintiffs' excessive force and state law battery claims.

The problem is that a rule 41(a)(2) voluntary dismissal "can only be for an entire action, and not an individual claim." *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023). Rule 41(a)(2) does

not allow plaintiffs and district courts to "pick and choose, dismissing only particular claims within an action." *Id.* (quotation omitted). "Our 'cases make clear that a voluntary dismissal purporting to dismiss a single claim is invalid, even if all other claims in the action have already been resolved.'" *Id.* (quoting *In re Esteva*, 60 F.4th 664, 677–78 (11th Cir. 2023)). Because the district court "attempted to dismiss one [claim] rather than the entire action, no part of [r]ule 41(a) authorized the dismissal. And because the dismissal was ineffective," the failure-to-render-aid claim "is still pending before the district court." *See id.* "That means we have no final decision to review." *Id.* (citing 28 U.S.C. § 1291)

That should be the end of it. The summary judgment order was not final since the failure-to-render-aid claim was still pending. And because the summary judgment order was not final, we do not have jurisdiction to review it.

The plaintiffs offer two responses. First, they argue that they abandoned their failure-to-render-aid claim, and the judgment was properly entered on the abandoned claim. But the plaintiffs didn't abandon the claim; they sought to dismiss it. In their summary judgment response, the plaintiffs wrote (in bold) that they "dismiss their claims for failure to render medical aid against Deputy Santiago[-Miranda] and [Deputy] Hendren." And the district court treated the plaintiffs' summary judgment response not as an abandonment, but "as a [m]otion for [v]oluntary [d]ismissal." Like the district court, I read the plaintiffs' statement that they "dismiss their

23-11902            Luck, J., Dissenting            3

claims for failure to render medical aid against Deputy Santiago[-Miranda] and [Deputy] Hendren" as what it is—a dismissal.

Second, the plaintiffs contend that the district court's order was ambiguous about how it resolved the failure-to-render-aid claim. Because there was an ambiguity, the argument goes, we should presume the district court knew and applied the law and entered a lawful judgment. But there was no ambiguity in the district court's order. The district court handled the plaintiffs' dismissal of the failure-to-render-aid claim against Deputy Santiago-Miranda in five clear steps.

> Step one. The district court explained the plaintiffs' announcement to dismiss their failure-to-render-aid claim against Deputy Santiago-Miranda: "In [p]laintiffs' [r]esponse to [d]efendants' [m]otion for [s]ummary [j]udgment, [p]laintiffs state that they are no longer pursuing their claims for failure to render medical aid as to either of the deputies nor are they pursuing any of their claims against [Deputy] Hendren."

> Step two. The district court construed the announcement as a voluntary dismissal motion under rule 41(a)(2) and declared that it would grant the motion: "The [c]ourt construes this announcement as a [m]otion for [v]oluntary [d]ismissal pursuant to [rule] 41(a)(2), which will be granted."

Step three.  The district court spelled out the claims that were left over after the plaintiffs' voluntary dismissal:  "The following  counts in [p]laintiffs' [a]mended [c]omplaint remain, with the claims duplicated and alleged separately for each [p]laintiff: Counts 1 and 6—Fourth Amendment violations against [Deputy Santiago-]Miranda, pursuant to 42 U.S.C. [section] 1983; Counts 2 and 7—common law battery against [Deputy Santiago-]Miranda; Counts 4 and 9—deliberate indifference in training against [Sheriff] Ivey, pursuant to [section] 1983; and Counts 5 and 10—deliberate indifference in retention against [Sheriff] Ivey, pursuant to [section] 1983."  The failure-to-render-aid claim was not mentioned.

Step four.  In the decretal language at the end of the order, the district court granted the plaintiffs' construed voluntary dismissal motion:  "Plaintiffs' construed [m]otion for [v]oluntary [d]ismissal (Doc. 96 at 53) is **GRANTED**."  Helpfully, the district court's internal record cite was to the plaintiffs' announcement in the summary judgment response that they were dismissing the failure-to-render-aid claim against Deputy Santiago-Miranda.

Step five.  Finally, the district court granted summary judgment on the left over claims:  "Defendants'

23-11902                  LUCK, J., Dissenting                  5

[m]otion for [s]ummary [j]udgment . . . is **GRANTED**.”

Reading the steps together, the district court told us what it was going to do (construe the plaintiffs' announcement that they were dismissing the failure-to-render-aid claim against Deputy Santiago-Miranda as a motion to dismiss voluntarily under rule 41(a)(2)), and did it (granted the voluntary dismissal motion). There was nothing ambiguous about what the district court did. For that reason, I would dismiss the appeal for lack of appellate jurisdiction.